IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 10, 2018

**STATE OF TENNESSEE v. RONALD ELLIS**

**Appeal from the Criminal Court for Shelby County**
**No. 14-04664        James C. Beasley, Jr., Judge**

_____

**No. W2017-01035-CCA-R3-CD**

_____

On January 12, 2017, the Defendant, Ronald Ellis, was convicted of first-degree premeditated murder. The trial court sentenced him to life imprisonment in the Department of Correction. The Defendant argues on appeal that the evidence is insufficient to sustain his conviction because he was mentally incapable of premeditation at the time of the murder. He further argues that the trial court erred in denying his motion to suppress his confession and statement, asserting that both were obtained in violation of his Miranda rights, and that the aggregate effect of trial errors entitles him to a new trial. After thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Charles S. Mitchell, Memphis, Tennessee, for the appellant, Ronald Ellis.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Theresa McCusker and Glenda Adams, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On September 23, 2014, a Shelby County grand jury indicted the Defendant for the first-degree premeditated murder of his ex-girlfriend, Torhonda Cathey. The Defendant then filed, and later amended, a motion to suppress his confession and statement made to law enforcement. After the denial of his motion to suppress, he was

convicted of first-degree premediated murder and sentenced to life imprisonment in the Department of Correction. We now review the facts relevant to this appeal.

## Suppression Hearing

The trial court heard the Defendant's motion to suppress on January 9 and 10, 2017. The Defendant's motion sought to suppress the formal written statement he made to Memphis law enforcement and oral statement he made to Georgia law enforcement. He asserted these statements were elicited in violation of his Miranda rights.

Detective Fausto Frias, a homicide detective with the Memphis Police Department ("MPD"), testified at the hearing that he was assigned to investigate Ms. Cathey's death and was consequently sent with Sergeant Michael Brown to a small town in Georgia to interview the Defendant after his arrest by Georgia law enforcement. He interviewed the Defendant in the local jail facility after they "went over his Miranda rights . . . [a]nd he agreed to talk to us by waiving his rights. [The Defendant] did it both verbally and in writing[.]" Detective Frias further testified that during the interview the Defendant never asked for a lawyer, was offered food, water, and restroom breaks, and did not appear to be under the influence of any intoxicants. He verified that the Defendant signed an Advice of Rights form in his presence which stated that no coercion was used to obtain the statement and that the Defendant understood and waived his rights.

Although the Georgia jail facility lacked the technology to take a typed statement as is customary for MPD, Detective Frias testified that the Defendant's statement was recorded, played back to him, and later transcribed. Both the audio recording and the transcribed statement were entered into evidence with no objections from the Defendant. In his statement, the Defendant confessed to killing Ms. Cathey after driving around looking for her. He verified multiple times in his statement that he was giving it of his own accord. On cross-examination, Detective Frias stated that he was "not familiar with [the Georgia jail] system" and therefore had no personal knowledge of whether the Defendant had access to a telephone during his incarceration in Georgia, but assumed that he did. He further testified that during the interview the Defendant did not seem "harmed" and looked "well . . . like a middle linebacker from a football team[,]" despite the Defendant expressing that his job as a Memphis Firefighter was stressful. The trial court denied the motion to suppress with respect to the Defendant's formal statement, finding that the statement was "freely and voluntarily given with full knowledge of his rights and that he waived those rights."

The trial court continued the motion to suppress hearing the next day with respect to the oral statement the Defendant made to Georgia law enforcement. Sergeant Steven McKinney, employed by the Camden County Sheriff's Office in Georgia, testified that he

took the Defendant into custody on September 11, 2014. He stated that a "small chase" of the Defendant ended after he ran over tire spikes in his vehicle. He further testified that he gave the Defendant "six or seven commands" to "drop [his] weapon or [Sergeant McKinney] was going to shoot him" before he finally complied. Officers then "tased" the Defendant when he refused to get on the ground. Sergeant McKinney testified that he then cleared the weapon, which was unloaded, and took the Defendant to the hospital to be "medically cleared for being tased."

While walking into the hospital, Sergeant McKinney said, "I'm glad you didn't make me shoot you today of all days[,]" to which the Defendant did not respond. He testified that he made such a comment because "[i]t was 9/11. We had just honored firefighters earlier that day. I'm a first responder. I'm also a police officer. And it was my decision to shoot or not shoot. And if Mr. Ellis had raised that gun or even flinched it I would have had to shoot him. . . . I just told him . . . I understand what you're accused of. I just thank you for not making me shoot you today." Sergeant McKinney testified that he did not ask the Defendant anything about the allegations against him and "didn't even have any specifics or anything about what happened other than he was suspected for murder." While waiting in the hospital approximately ten minutes after making his comment, Sergeant McKinney testified that the Defendant stated, while keeping his head down, "that's what I wanted." Sergeant McKinney responded "excuse me[,]" because he "didn't understand . . . what [the Defendant] was responding to." The Defendant then explained that "[he] wanted [Sergeant McKinney] to shoot [him]," to which Sergeant McKinney responded "yes, sir. That's what I figured." The Defendant then told him "the gun wasn't loaded[,]" which Sergeant McKinney stated he already knew because he "cleared it on the side of the road." The Defendant then commented "that's because I threw the bullets away after I shot her."

Sergeant McKinney testified that he was "absolutely not" questioning the Defendant during this interaction, and therefore did not Mirandize him. He did, however, "advise[] him that he probably didn't want to say anything else" after the Defendant's statement regarding the bullets. Following the close of all proof, the trial court found the statement was "just a spontaneous statement" and the interaction was not "an interrogation under the rules that are required for Miranda purposes as far as being in custodial interrogation." The trial court further stated that the Defendant was "definitely in custody," but without "any interrogation going on by the officer." Accordingly, the trial court denied the Defendant's motion to suppress in full.

### Trial

At trial, Gloria Sweet-Love testified that Ms. Cathey was "like [her] daughter" and would "tell [her] things." She stated that Ms. Cathey was not dating the Defendant at the

time of her murder and had not "dated him in a while[,]" estimating that it had been "months . . . more than a year" since they dated, and even believed her to be in "another relationship" at the time of her death. Brandon Ethridge, the fleet manager for Avis Rental Group, testified that the Defendant rented a white Ford hatchback from Avis on the morning of September 8, 2014. Martrell Watt, a Target security guard, testified that he saw the shooting take place in the parking lot and verified that the Target security footage accurately depicted the shooting as it occurred.

Dijon Brice testified at trial that she was with her boss, Shayne Nelson, at Target on September 8, 2014. She testified that they "witnessed a shooting in the parking lot" and "took off running toward [Ms. Cathey's] screams" of "Help. Please stop. Help[,]" though she could not see Ms. Cathey. As they approached Ms. Cathey, she "came out from between the cars holding her leg dragging it, bleeding, screaming[,]" while the Defendant "came up behind [Ms. Cathey] and he shot her two more times in her back" while they were standing "close" to Ms. Cathey. She remembered that the Defendant "tried to fire and it wouldn't" and he "did something" to fix it before firing the two shots that Ms. Brice and Mr. Nelson witnessed.

Ms. Brice further testified that after the shooting the Defendant "calmly like a robot . . . jogged slowly off." She said that "[The Defendant] was focused on [Ms. Cathey]" and was "very calm." On cross-examination, Ms. Brice stated that the Defendant seemed as if "he had one thing to do and . . . it was to shoot [Ms. Cathey] that day[,]" and he "didn't look away" from Ms. Cathey even with Ms. Brice and Mr. Nelson yelling "curse words trying to get his attention and [Mr. Nelson] running ahead[.]" Mr. Nelson's trial testimony wholly echoed Ms. Brice's. He stated that the two ran towards Ms. Cathey's screams and saw the Defendant shoot her twice in the back. He further testified that he took pictures with his cellular phone of the Defendant's "little white car" as he left the Target parking lot.

Michael Brown, who previously worked as a sergeant with the Memphis Police Department, testified that he was one of the homicide detectives assigned to Ms. Cathey's murder in 2014. He accompanied Detective Frias to interview the Defendant in Georgia. He further stated that Memphis Fire Chief Larry Fletcher, who testified accordingly at trial, contacted MPD with concerns that the Defendant had become suicidal. Various other law enforcement personnel also testified regarding the chain of custody of the Defendant's gun and the bullet that medical personnel removed from Ms. Cathey. Further, both the Chief Medical Examiner for Shelby County and a forensic scientist for the Tennessee Bureau of Investigation testified regarding the manner in which Ms. Cathey's bullet wounds occurred and that ballistics testing showed that the Defendant's gun fired the recovered bullets, respectively.

- 4 -

Sergeant McKinney also testified at trial. He reiterated that he thanked the Defendant for not forcing him to shoot him and the Defendant stated approximately ten minutes later that he wanted police to shoot him, and that he had thrown the bullets from his gun away "after he shot [Ms. Cathey]." Officer Brandon Shea, employed in Georgia by the Kingsland Police Department in 2014, testified at trial that he was also present when the Defendant was arrested after the police chase and the Defendant did not, "at any time[,]" point his gun directly at officers.

Detective Frias testified at trial, again stating that the Defendant signed an Advice of Rights form which stated that he understood and waived his rights. He further read part of the Defendant's statement into evidence, specifically that the Defendant replied affirmatively when asked if he understood his rights and wished to waive them, and confessed that he had shot Ms. Cathey in the Target parking lot on September 8, 2014. Detective Frias also read part of the Defendant's statement into evidence in which he admitted that he "drove by [Ms. Cathey's] job[,]" and when he realized she was not there, "started driving by the place[s] [he] knew she would frequent and got to the Target and saw her car[,]" shooting her after he saw her get into her vehicle.

The Defendant testified on his own behalf. He testified that he was "stressed out, depressed[,]" had gone "three or four days without sleep[,]" and was "drinking alcohol and taking Ambien" together at the time of the murder. He said that Ms. Cathey had been the one to end their relationship, putting it "like in a yoyo." He stated that he had discussed his financial and work-related stress with his doctor, one of his fire chiefs, and a counselor. The Defendant testified that on the morning of the murder he was "really agitated," "angry[,]" and "hurt." He wrote a note stating, "Today is a good day to die. Forgive me Father." After procuring a rental car, he sent a "suicide" text message to several people and went to Ms. Cathey's place of employment "because she was the only person at the time" that he needed to talk to, even though they had not spoken in "several months." When he did not see her vehicle there, he drove to places he knew she went on her lunch break, including the Oak Court Mall and Target.

Upon seeing her vehicle in the Target parking lot, the Defendant testified that he parked his vehicle near hers and "sat there and waited until she came out." He walked up to her car and called her name, and she looked at him but did not respond. The Defendant testified that he then fired the first shot through her vehicle's window, startling her and causing her to drive into the vehicle parked in front of her. She then began screaming and trying to get away from him while he "tried to talk to her[.]" After shooting her in the leg, the Defendant testified that he "waited until she got out" of her vehicle and "just looked at her. [He] got ready to raise [his] gun again, but it had jammed. So [he] had unjammed it." He stated that he remembered "racking the weapon" and "raising the gun up and firing it," but "didn't know [he] was hitting her." He also

- 5 -

testified that Mr. Nelson "was the only other person that [he] thought about shooting[,]" but "didn't see no reason to shoot him." He further stated he then drove to Ms. Cathey's apartment, throwing the bullets from the gun and his cellular phone from the car on the way there. After waiting there for several hours, he drove through Florida and into Georgia where he was apprehended.

Following the close of all proof, the Defendant was convicted of first-degree premediated murder and sentenced to life imprisonment in the Department of Correction.

## ANALYSIS

The Defendant argues on appeal that the evidence is insufficient to sustain his conviction of first-degree premeditated murder because he was mentally incapable of premeditation at the time of the murder. He also argues that the trial court erred in denying his motion to suppress his confession and statement, asserting that they were obtained in violation of his Miranda rights because his confession was not knowing and voluntary due to "the state of his mental health" and because he was not "brought before a judicial magistrate" in Georgia. He further argues that his comment to Georgia law enforcement should have been suppressed because he was not read his Miranda rights, and that cumulative error entitles him, at the very least, to a new trial.

### I. Sufficiency of the Evidence

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the
> jury see the witnesses face to face, hear their testimony and observe their

demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

To sustain the first-degree murder conviction, the State had to prove beyond a reasonable doubt that the Defendant committed a first-degree premeditated and intentional killing of the victim. See Tenn. Code Ann. § 39-13-202(a)(1). As defined by statute:

"Premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully

considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed factors that support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon; preparations to conceal the crime and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

Viewed in the light most favorable to the State, the evidence shows that the Defendant obtained a rental car and went to Ms. Cathey's place of employment, continuing to seek her out when he discovered she was not there, and, upon locating her, shot Ms. Cathey, who was unarmed, a total of five times, including twice in the back while she attempted to flee, dragging her injured leg behind her. He also testified that he racked his gun after it jammed so that he could continue shooting Ms. Cathey. Showing a possible motive for the murder, the Defendant testified that he felt Ms. Cathey had treated their relationship like "a yoyo" after she ended it several months prior to the shooting. Further, the evidence demonstrates that the Defendant failed to render aid to Ms. Cathey, had a calm demeanor after the shooting, and discarded bullets from his gun and his cellular phone before leaving the state. The Defendant also attempted to evade Georgia law enforcement when they tried to detain him. Therefore, several of the above factors fit the circumstances surrounding Ms. Cathey's murder, and such circumstances accordingly support the inference of premeditation. See Jackson, 173 S.W.3d at 409; Thacker, 164 S.W.3d at 222; Leach, 148 S.W.3d at 54; Nichols, 24 S.W.3d at 302; Bland, 958 S.W.2d at 660. As we previously stated, whether premeditation exists is a question of fact to be determined by the jury. Although the Defendant argues that he was not mentally capable of premeditation because he was "drinking alcohol and taking Ambien" together, the jury obviously discredited this assertion. Based on the foregoing, we conclude the evidence is sufficient for a rational trier of fact to infer that the Defendant premeditated the killing.

## II. Motion to Suppress

The Defendant next argues that the trial court erred by denying his motion to suppress his confession and statement to police. When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The factual findings made by the trial court at a motion to suppress hearing are binding on the appellate court unless the evidence preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S .W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). However, Miranda warnings are not required in the absence of custodial interrogation. State v. Northern, 262 S.W.3d 741, 749 (Tenn. 2008) (citing Miranda, 384 U.S. at 478). "[T]he requirements of Miranda come into play only when the defendant is in custody and is subjected to questioning or its functional equivalent." State v. Walton, 41 S.W.3d 75, 82 (Tenn. 2001). The United States Supreme Court has held that a Miranda interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhodes Island v. Innis, 446 U.S. 291, 301 (1980). Further, "Volunteered statements of any kind are not barred by the Fifth Amendment[,] and their admissibility is not affected" by the holding of Miranda. Miranda, 384 U.S. at 478; see also State v. Hurley, 876 S.W.2d 57, 66 (Tenn. 1993); State v. Ensley, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996).

With respect to the Defendant's statement of "that's because I threw the bullets away after I shot her[,]" Sergeant McKinney testified at the suppression hearing that the

comments he made to the Defendant regarding his gratefulness for not having to shoot him were made solely because it was September 11th and he did not want to shoot a fellow first-responder after honoring firefighters earlier in the day. Although the Defendant argues that Sergeant McKinney brought up his occupation as a firefighter in order "to illicit [sic] an incriminating response by [the Defendant] by stating one of [his] largest points of stress[,]" Sergeant McKinney testified that he had no knowledge of any of the circumstances surrounding the shooting, only that the Defendant was suspected of murder. There was therefore no way that Sergeant McKinney should have known that firefighting was a "point[] of stress" or that such a statement was "reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 301.

Sergeant McKinney's testimony further demonstrates that he did not question the Defendant. During their exchange, the only statement that could have likely elicited a response from the Defendant was Sergeant McKinney saying "excuse me" when he did not understand what the Defendant was saying. Approximately ten minutes passed after Sergeant McKinney's thanking the Defendant before he began making comments, during which Sergeant McKinney said nothing to the Defendant. Further, Sergeant McKinney advised the Defendant to stop talking as soon as he said something incriminating. In deciding not to suppress the Defendant's statement, the trial court found:

> [E]ven if it was in response it was five or ten minutes according to the testimony later. So to me it was just a spontaneous statement made by Mr. Ellis. Now, it may have been in response to some comment that the officer made. But I don't think it was an interrogation under the rules that are required for Miranda purposes as far as being in custodial interrogation. I don't think that it meets that criteria. So I think it's just a statement. And I think it's admissible.

Although the Defendant was undoubtedly in custody, there is nothing in the record to suggest that the exchange amounted to an interrogation or its functional equivalent. Absent a custodial interrogation, Miranda warnings are unnecessary, and volunteered statements are not within the purview of Miranda. Miranda, 384 U.S. at 478; Northern, 262 S.W.3d at 749. There is sufficient evidence in the record to support the trial court's finding that the Defendant was not subject to interrogation or its functional equivalent by Sergeant McKinney and gave a voluntary spontaneous statement, therefore making Miranda warnings unnecessary. Based on these circumstances, we conclude that the Defendant, though in custody, was not interrogated by Sergeant McKinney and voluntarily made the statement of "that's because I threw the bullets away after I shot her." The Defendant is not entitled to relief based on this issue.

Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986). Our supreme court has concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). In order for a confession to be considered voluntary in Tennessee, it must not be the result of "'any sort of threats or violence . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Courts look to the totality of the circumstances to determine whether a confession is voluntary. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

Tennessee Rule of Criminal Procedure 5(a)(1) ("Rule 5(a)(1)") states that "[a]ny person arrested—except upon a capias pursuant to an indictment or presentment—shall be taken without unnecessary delay before the nearest appropriate magistrate." Our supreme court has stated that "a delay of less than forty-eight hours is presumptively reasonable" and that when the delay exceeds forty-eight hours, the State must show that "'a bona fide emergency or other extraordinary circumstance' caused the delay." State v. Bishop, 431 S.W.3d 22, 42 (Tenn. 2014) (quoting County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991)). However, our supreme court has held that even in the event of a Rule 5(a)(1) violation, such a violation is but "one factor to be taken into account in evaluating the voluntariness of a confession; and if the totality of the surrounding circumstances indicates that a confession was voluntarily given, it shall not be excluded from evidence solely because of a delay in carrying the confessor before a magistrate." State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting State v. Readus, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988)). The relevant factors in determining the voluntariness of a confession are:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep [,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

<u>State v. Climer</u>, 400 S.W.3d 537, 568 (Tenn. 2013) (emphasis added) (quoting <u>Readus</u>, 764 S.W.2d at 790). No single factor is necessarily determinative. <u>State v. Blackstock</u>, 19 S.W.3d 200, 208 (Tenn. 2000).

With regards to the Defendant's confession, Detective Frias testified at the suppression hearing that he went over the Defendant's rights with him prior to interviewing him. The Defendant waived those rights both orally and in writing through the Advice of Rights form. He and Sergeant Brown made an audio recording of the Defendant's statement, which was later transcribed after the Defendant verified that it was accurate. Detective Frias also stated that during the interview the Defendant never asked for a lawyer, was offered food, water, and restroom breaks, and did not appear to be under the influence of intoxicants. He appeared well and was described by Detective Frias as resembling "a middle linebacker." The Defendant verified during the interview that he was making his confession of his own accord. The trial court determined:

> It appears to me that [the Defendant] was advised of his rights, that he understood his rights, that he freely and voluntarily waived his rights. There is no indication in reviewing the statement that he seemed to be in any form of distress. I don't have any indication that he was hungry or thirsty or stressed or tired or anything like that that would overborne his will. The fact that he was in custody for four or five days before the [Memphis] officer took a statement I don't think has any bearing on anything without anything to the contrary.

The trial court's finding is supported by the testimony of Detective Frias, who stated that he had no personal knowledge as to whether the Defendant had been in jail without representation or telephone access before he and Sergeant Brown arrived in Georgia to interview him. Further, he testified that the Defendant appeared well and was offered food, water, and restroom breaks during their time with him. The Defendant argues, however, that his confession was involuntary because he was mentally incapable of asserting his rights because of insomnia, drinking alcohol, taking Ambien, and being suicidal. He further asserts that he was not taken before a magistrate during his six days in the Georgia jail in violation of Rule 5(a)(1), also making his confession involuntary, such that is should be automatically suppressed.

We initially note that the Defendant failed to offer any proof that he was not taken before a magistrate in Georgia, and he also did not explicitly make such argument until his motion for a new trial. The trial court stated at that hearing that it did not "recall having any litigation about whether [the Defendant] was taken before a magistrate" and therefore "could not address" that argument at the hearing.

Even if we were to assume that the Defendant was not brought before a magistrate in Georgia, despite a paucity of evidence to support such an assertion, such a delay is but one factor we consider in determining the voluntariness of a confession. In considering the other relevant factors, the record suggests that the Defendant has a high IQ. He was advised of his <u>Miranda</u> rights before being interviewed and waived those rights both orally and in writing. He acknowledged that he understood the rights he was waiving and never refused to answer questions or asked for an attorney. There was both an audio recording and a transcription of his statement. There was no evidence, other than the Defendant's testimony, that his physical or mental state at the time of his confession made him incapable of waiving his rights. Further, there was no evidence to suggest that the Defendant suffered actual or threatened physical or psychological abuse, was under the influence of intoxicants, or was deprived of any necessities. In fact, Detective Frias testified that although the Defendant was held in the Georgia jail for six days before Memphis officers were able to question him, he appeared well and was offered food, water, and restroom breaks during the interview. There is no evidence in the record that the Defendant continued to consume Ambien and alcohol while in the Georgia jail, and the transcribed statement indicates that the interview was less than an hour in length. Under the totality of the circumstances, we cannot conclude that the alleged delay in being brought before a magistrate made the Defendant's confession and waiver of his rights involuntary. In fact, the relevant factors suggest that the Defendant's statement and waiver were made voluntarily. There is sufficient evidence to support the trial court's finding of voluntariness.

### III. Cumulative Error

The Defendant finally asserts that, because of cumulative error at trial, he is entitled to a new trial or, alternatively, a reversal of his conviction. Our supreme court has found that "[t]o warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." <u>State v. Hester</u>, 324 S.W.3d 1, 77 (Tenn. 2010). We have considered each assertion and found no such errors. Accordingly, since we found have no individual errors, there can be no finding of cumulative error. The Defendant is not entitled to relief for cumulative error.

### <u>CONCLUSION</u>

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE